CARNES *v.* GUELPH PATENT CASK CO.

MASTER AND SERVANT—DEATH OF SERVANT—DANGEROUS EMPLOYMENT—INSTRUCTIONS—ASSUMPTION OF RISK.

In an action for the death of a servant working on a rollway of logs, caused by the collapse of the pile of logs, evidence examined, and *held,* that the conclusion that deceased knew how the appliances were made and the manner of doing the work was irresistible and that the direction of a verdict for defendant was proper.

Error to Benzie; Chittenden, J. Submitted April 27, 1905. (Docket No. 101.) Decided July 21, 1905.

Case by Cora A. Carnes, administratrix of the estate of

Lutherford B. Carnes, deceased, against the Guelph Patent Cask Company for the negligent killing of plaintiff's intestate.    There was judgment for defendant on a verdict directed by the court, and plaintiff brings error. Affirmed.

*Charles A. Withey* (*D. G. F. Warner*, of counsel), for appellant.

*Nims, Hoyt, Erwin, Sessions & Vanderwerp*, for appellee.

MOORE, C. J.    This is a negligence case, brought under the survival act by the plaintiff, as the administratrix of her late husband's estate.    The defendant was engaged in running a saw and veneering mill at Wolverine, Mich., and banked its logs for summer use on its grounds near the mill in some 20 rollways, piled about 10 rods long and 14 to 16 feet high.    In placing the logs in these rollways, the whole front of the banking ground was carried along at once, or nearly so, in order to give numerous teams a chance to unload as they came from the woods, thus avoiding one waiting for the other.    The logs fell from the sleighs upon skids about 30 or 40 feet long lying upon the ground.    Beyond these skids were short ones, also upon the ground, for the purpose of enabling the chainman to pass the decking chain under the logs to be put up on top of the rollways.

The work of rolling the logs on the long skids to near the rollways was called "tailing down."    When the logs reached the short skids they were left by the tailers, and the chainmen put them in place to be chained and sent up. They were elevated to the top of the rollways by means of other skids standing in an inclined position, with one end on the ground and the other on top of the rollway, the logs being rolled up these inclined skids by means of a block and chain and horse power.    The chain at the log end had a crotch, one side of which was passed under each end of the log, the ends of the crotched chain being on top

of the rollway.   The log would lie in a loop, so that when the team was put in motion it would be rolled up the skids to the desired point on the rollway.   On the day when decedent was killed, one of the top men did not appear, and one of the chainmen took his place, and decedent took the chainman's place.

About 11 o'clock in the forenoon it became necessary to move the inclined skids from the face of the rollway for the purpose of putting more logs at the bottom and in front of the face to strengthen it, there having been evidence of its being weak for some moments before.   These inclined skids were green poles some 16 feet long and 6 inches through, with an iron at the top end where they rested on the top log of the rollway in the shape of a "T," the upright bar of the "T" being lengthwise and the top bar crosswise of the skid, with each end of the crosspiece turned down into a sharp spike.   These spikes were driven into the logs where the skids rested by the weight of the other logs as they passed over the skids on their way to the top of the rollway, and were for the purpose of holding the skids in place so they would not move sidewise, or "scoot up with the logs." There were two ways of removing the skids from the face of the rollways—one, just to step up with the man's back to the rollway, take the skid on the shoulder and walk away with it; if it was considered dangerous to move the skid, to take a canthook and loosen the ground end so as to test the strength of the face before shouldering it.   Almond Jones was chaining at one end of the logs on the forenoon in question, and when the time came to move the inclined skids stepped up to the one on his end of the rollway and took it on his shoulder.   At this moment decedent went to the other skid, and was seen by one of the top men to pass under it, and the next instant the rollway went out. One of the top men ran up the deck and escaped, the other went down with the front, but was not hurt.   Decedent was caught between the logs of the rollway and those that were lying on the ground in front of it, and so crushed that he died in about two hours.

At the close of the evidence on the part of the plaintiff, the defendant moved for a directed verdict, and the motion was granted, the court holding that no negligence was shown against defendant; that, if any was shown, it was that of a co-servant; that the risk was obvious; that decedent was guilty of contributory negligence. The case is brought here by writ of error.

It is the claim of plaintiff that her husband was by trade a metal polisher; that until the day of his death he had never worked on or about the rollway; that he was not likely to see the iron in the upper part of the skid, so that the danger was latent; that he did not appreciate the danger of removing the skid; that he was set at this dangerous work without being informed of its dangerous character; and that the questions involved should have been left to the jury by the judge, instead of directing a verdict. No witnesses were sworn on the part of the defendant. There is no direct proof as to what instructions were given to deceased when he was set at this work. It is true some of plaintiff's witnesses say they did not hear any instructions given to him, but there was abundant opportunity to give him instructions without the witnesses who were sworn hearing it. We do not need, however, to decide what the presumption would be under such a state of facts. The record shows the deceased was 24 years old. There is nothing to show he was not a man of at least ordinary intelligence. He had worked in the woods that winter for the defendant about 45 days. His work was clearing away for the teams and placing skidways. He then went to work in the yard where this and other rollways were in process of building. He then constituted a part of a crew whose work resulted in getting the logs from the sleighs that brought them to the yard into the rollways where they remained until they were to be manufactured later. Some of these men unloaded the logs. Mr. Carnes helped to tail them down from where they were unloaded to the men who passed them up the skids into the rollways. His

work took him near the front of the rollways, where the skids were in constant use, and the logs which he assisted in taking down were put into the rollways. It did not require more than a superficial knowledge of the work to know that if there was not something at the top of the longer skids to hold them in place the impact of the log striking the skids at the lower end would carry them forward to the front of the rollway, do away with the incline, and project the upper end of the skids above the top of the rollway; or, as stated by one of the witnesses, the skids would "scoot up with the logs." Mr. Carnes had been at work helping send the logs up the rollway from where they were left by the tailmen all the forenoon until nearly 11 o'clock, when the accident occurred. His father-in-law was a witness for plaintiff. On the cross-examination he testified:

" *Q.* Now, Mr. Carnes had been tailing down, you say. How far down was he assisted in tailing down the logs— how close to the rollway as it was being constructed ?

"*A.* The men that tailed down usually brought them clear down to the skidways, provided there was no log there. They just merely kept the back moved up so that the chainmen could get them without traveling so far after them.   *   *   *

"*Q.* So that during the two weeks, or such a matter, that Mr. Carnes was there assisting in unloading and in tailing down logs, he was in the immediate vicinity of where they were putting up the rollways, was he not ?

"*A.* Yes, sir; principally so. At times a few rods away, and at other times within a few feet. All of that time when he was working he was where he could see what was being done, and the manner of building the rollways—what they did, and what the different men did. *   *   * The usual crew was six men. There were two topmen and two chainmen, and two men unloading and tailing down. Besides that there was a teamster to help unload, and the foreman. The foreman did whatever was necessary. He was working there at different things, doing the common work. When it was necessary to give assistance in tailing down or unloading, he did that, part of the time, and when it was necessary, if some of the

men were temporarily away—one of the topmen, for instance—he went and took his place. If a chainman happened to be away for a while, if he didn't have a man to put in his place he acted as chainman. He did whatever was necessary in the common operation, and taking care of those logs there, and putting them in the rollway, along with his men.

"*Q.* When the logs came in on the sleighs, they were unloaded, dropped down onto those flat skids, weren't they?

"*A.* Yes, sir. Some of the loads at that time were quite high. Then they were rolled back to the foot of the rollway as it was being constructed, and then they were taken from there and put up as I have described. * * *

"*Q.* Now, all of those men that were on the yard constituted one crew, didn't they?

"*A.* Yes, sir, that is, the men that were unloading, the men that were tailing down, the scaler, the chainmen, the topmen, and the foreman, all constituted one crew. Mr. Carnes had been working with this crew for about two weeks."

Mr. Bigelow, who was a witness for plaintiff, described the accident as follows:

"*Q.* Up to the time it went out, you say, you hadn't any knowledge that the front was weak; you hadn't heard anything said about it?

"*A.* Till just a few minutes before. It hadn't been more than two or three minutes before that.

"*Q.* What did you learn about it then, if anything?

"*A.* I heard that it was shaky, to watch it.

"*Q.* Did you hear something said about it?

"*A.* Yes, sir. I don't remember just who said it. I can't repeat the words. As near as I can tell, it was said to watch out, that it was shaky, and not to—hadn't better —put up any more logs. They said the skidway was shaky.

"*Q.* Did they say that the front was shaky, or just call out, as they usually did, that it was shaky?

"*A.* That was the usual way to speak.

"*Q.* They gave the usual warning?

"*A.* Yes, to watch out; that it was shaky. I stayed on the front log for a few minutes. When the fact of the front being shaky was spoken of, Mr. Jones was at the north end of the rollway, on the ground. If my

memory serves me right, Mr. Welcome was standing close by.

" *Q.* Where was Mr. Carnes?

"*A.* He was at the south end.   Mr. Welcome was then foreman of the banking ground.   He hired and discharged the men on the banking ground.   He also told them where to work and what to do.

" *Q.* When did you last see Mr. Carnes before he was hurt?

"*A.* He was in the act of taking the skid down.   He walked up to his skid, and was just in the act of taking it away, and I happened to think that it might go down, and I stepped back, and I didn't see him any more.

" *Q.* Whereabouts, as to the skid, was he when you last saw him ?

" *A.* He just kind of stepped in behind it.

" *Q.* Under it, back of it ?

"*A.* Yes, sir; and I stepped back, and the rollway started.   The next I saw him he was lying on the ground out to the front end of the skidway."

On the cross-examination he said :

" The accident occurred about half past 10 or 11 o'clock in the forenoon.   I was working as a topman at the north end of the rollway.   That was the end where Mr. Jones was working as chainman.   Some two or three minutes before the rollway gave way somebody stated that it was shaky, and to watch out.   At that time Mr. Jones was in front of the rollway, and near it.   Mr. Carnes was at the other end of the log, and in front of the rollway.

" *Q.* As a matter of fact, had you not thrown your hooks down each way with the intention of bracing the front of that rollway at the time of the accident ?

"*A.* Yes, that was our intention.   Our purpose was to build up in front, because the rollway had become shaky. I can't remember whether there was a log in between the foot of the skids and the front of the face of the rollway. I remember there were two logs a few feet in front of the foot of the skids, and it was the intention to put those two logs in the bottom.   That was why we had thrown our chains down and were removing the skids.   It was our intention to brace it before finishing out the rollway.   It was preparatory to doing that—to bracing up the front of the rollway—that Mr. Carnes and Mr. Jones were removing their skids.

"*Q.* It was apparent to you and Mr. Carnes, or to any situated as you men were, that it was dangerous to be in front of that rollway?

"*A.* Yes, sir.

"*Q.* Was Mr. Carnes in a position where, if he had looked, he could have seen the dangerous condition of matters in front of that rollway?

"*A.* He could."

Mr. Jones, who was working with the deceased as a chainman when deceased was hurt, gave his version of how the accident happened. On the cross-examination he testified:

"A few minutes before the accident occurred I noticed that the face of the rollway was shaky.

"*Q.* Was that shaky condition apparent to any observer who had looked?

"*A.* To any one that saw it; yes, sir.

"*Q.* It was apparent to any one who was there in the presence of the rollway?

"*A.* Yes, sir; if they had looked to see. Besides that, at the time I discovered its shaky condition, the fact that it was shaky was mentioned. It was stated to the topmen that it was shaky. I don't remember what was said. It was a very common thing on occasions of that kind to tell them to watch out, that it was shaky or unsafe, or some such expression. Some such expression was used by me at that time, and I knew from the actions of the topmen, and by what was done there, that I was understood.

"*Q.* That was in the presence of Mr. Carnes?

"*A.* Yes, sir; he was as near to me as the other men that were working there, the topmen, and could have heard it had he been listening.

"*Q.* From his actions, what can you say whether or not he heard it; that is, from what he did after that?

"*A.* He certainly heard it, or he wouldn't have been preparing to remove his skid."

There is other testimony of much the same character, which it is unnecessary to quote.

It is impossible to read this record without reaching the conclusion that Mr. Carnes knew how the skids were made, and the manner of doing the work. We think the judge properly directed a verdict. *Beesley* v. *F. W.*

*Wheeler & Co.,* 103 Mich. 196 (27 L. R. A. 266); *Petaja*
v. *Mining Co.,* 106 Mich. 463 (32 L. R. A. 435); *Welch* v.
*Brainard,* 108 Mich. 38; *Minnie* v. *Mueller,* 140 Mich. 3.
   Judgment is affirmed.

GRANT, BLAIR, MONTGOMERY, and OSTRANDER, JJ.,
concurred.